## Case No. 11,334.

### POTTER et al. v. MULLER.

[2 Fish. Pat. Cas. 465.] [1]

Circuit Court, S. D. Ohio.    April, 1864.

INJUNCTION IN PATENT CAUSES—PRESUMPTION IN FAVOR OF PATENT—LENGTH OF POSSESSION.

1. Injunctions in patent cases are now granted without a previous trial at law, in cases where the owner of the patent shows a clear case of infringement, and has been in the possession and enjoyment of the exclusive right for a term of years without any successful impeachment of its validity.

[Cited in White v. Heath, 10 Fed. 293; Dickerson v. De La Vergne Refrigerating Mach. Co., 35 Fed. 144.]

2. There is no fixed rule as to the length of time the possession and enjoyment of the right under a patent shall have continued. It must be sufficient to justify a presumption in favor of its validity.

3. The presumptions in favor of a patent, arising from the length of possession and enjoyment since its issue, are greatly strengthened by the fact that its validity has been affirmed and sustained by prior judicial decisions, either at law or in equity.

4. The first claim of A. B. Wilson's reissue 346 does not involve or require the agency of the needle to make it valid or effective. The invention of Wilson is not anticipated by a feed wheel armed with short metal points to hold the cloth, and which prevent it from being turned, so as to sew curved seams at the pleasure of the operator.

5. The rights emanating from and existing under a patent are as sacred and as well entitled to protection as any other species of property.

6. Although it is conceded that to justify the stringent remedy by injunction, the party seeking it should clearly establish his right, yet, when so established, it is not only a rightful, but often the only remedy which is available for him.

In equity. This was a motion [by Orlando B. Potter, Nathaniel Wheeler, and others] to dissolve a provisional injunction, granted to restrain the defendant [Anton Muller] from infringing reissued letters patent Nos. 346 and 414, for "improvements in sewing machines," issued to Allen B. Wilson, and more particularly set forth in the report of Potter v. Wilson [Case No. 11,342]. The defendant claimed to be the first and original inventor of the improvements patented to Wilson, and denied infringement.

S. S. Fisher, for complainants.
George E. Pugh, for defendant.

LEAVITT, District Judge. This is an application to dissolve the preliminary injunction granted in this case. The injunction was allowed after due notice to the defendant, but without opposition on his part; and the only question on the pending motion is, whether it is a proper case for the allowance of the writ? If the court is now satisfied that the order for the writ ought not to have been made, the injunction will be dissolved; if otherwise, it will be perpetuated.

The complainants aver in their bill that

1 [Reported by Samuel S. Fisher, Esq., and here reprinted by permission.]

they are the owners, by legal assignments, of the exclusive right and benefit of a patent granted to A. B. Wilson November 12, 1850, for an improvement in sewing machines, which was subsequently surrendered by the patentee, and on January 22, 1856, two new patents issued, marked or designated as reissues No. 345 and No. 346, and that on December 9, 1856 (reissue No. 345 having been surrendered), a third reissue, 414, was granted, which said reissued patents covered the invention set forth in the original patent.

The bill alleges an infringement of the reissued patents 346 and 414, by the manufacture and sale of a large number of machines, at the city of Cincinnati, embodying substantially the invention of Wilson, as secured to him by his patents. The bill is sworn to by the complainants, and is sustained by affidavits proving the identity of the machines made and sold by the defendant with the improvements covered by Wilson's patents.

The defendant has filed an answer under oath, setting up in substance two grounds of defense: (1) That Wilson was not the original and first inventor of the improvements patented to him, and that his patent is therefore not valid; and (2) that the machines made and sold by the defendant do not infringe the invention patented to Wilson in 1850.

The present motion must be decided on the facts as they are before the court, without anticipating what may be the aspect of the case on the final hearing. And it is not, therefore, the duty of the court to notice any point made in the argument which has no application to the motion to dissolve the injunction.

The rule as to granting or continuing injunctions in patent right cases is now well settled by the modern usages of the courts of the United States. They are now granted without a previous trial at law in cases where the owner of the patent shows a clear case of infringement, and has been in the possession and enjoyment of the exclusive right for a term of years without any successful impeachment of its validity. Such possession and enjoyment, aided by the presumptions arising from the patent itself, are usually regarded as sufficient to warrant an injunction to restrain infringement. And there is no fixed rule as to the length of time the possession and enjoyment of the right under a patent shall have continued. It must be sufficient to justify a presumption in favor of its validity. In the present case, there can be no doubt of the fairness of such a presumption from the age of the patent. The original patent was issued in 1850, and nearly fourteen years had expired when this suit was commenced. Or, if dating back only to the reissues of 1856, the time of the possession and enjoyment of the rights under Wilson's patent includes nearly eight years.

But the presumptions in favor of a patent, arising from the length of time which has

elapsed since its issue, are greatly strengthened by the fact that its validity has been affirmed and sustained by prior judicial decisions, either at law or in equity.

This principle bears on the present case with unusual force. It is not of frequent occurrence that a patent is sustained so strongly by the weight of judicial authority as that now under consideration. And I am greatly relieved from the labor of investigating and deciding some of the points involved in the present motion by the adjudications referred to. They affirm clearly that the improvements referred to, or inventions described, by Wilson, in the specifications and claims of his patent, are the proper subjects of a patent, and are set forth by him in accordance with the requirements of the statute. They also satisfactorily establish the novelty and originality of his inventions, so far, at least, as the attempt was made to invalidate his claim in this case.

The court has been favored with copies of the opinion of Mr. Justice Nelson, as delivered by him in the circuit court for the Southern district of New York, and also of Judges Smalley, of the district of Vermont, and Ingersoll, of the district of Connecticut. I have read these opinions with care, and have no hesitancy in adopting their conclusions, both as to the law and the facts investigated by them. In one of the cases, before Justice Nelson, assisted by Judge Smalley, there was a very protracted and laborious trial, with full argument on both sides by counsel of eminent ability. The learned judge, in that opinion, as also another involving substantially the same questions, fully affirms the validity of Wilson's patent, both as to the sufficiency of the specifications and the novelty and originality of his invention.

As to the date of Wilson's invention, the learned judge, from the evidence before him, comes to the conclusion that it was perfected in the mind of the inventor as early as November, 1848, and that his first machine was completed in the month of April or May, 1849. The other judges referred to, in the cases before them, reach substantially the same result. They are fully sustained by the affidavit of Wilson, offered by complainants in resistance of the motion now before the court. Wilson is not a party to this suit, and the court is apprised of no reason why his affidavit is not entitled to entire credence. He states the facts connected with the date of his invention precisely as found by Judge Nelson, as above set forth; and in confirmation of these facts the affiant gives extracts from two periodicals published about the time his invention was perfected, in which it is referred to and minutely described. There is therefore no reason to doubt that as early as April or May, 1849, it was practically completed by the construction of a working machine, embodying the improvements covered by the patent of November 12, 1850, and the subsequent reissues.

The defendant, however, has set up in his answer that he was the inventor of an improvement in sewing machines substantially the same as that patented to Wilson. This claim is alleged for the purpose of impeaching the validity of Wilson's patent, as not being for a new and original invention. Without inquiring here whether there is any substantial identity between these inventions, it may be remarked that the proofs before the court clearly show Wilson's is prior in date to that claimed as the defendant's. The defendant swears, in his answer, that before he left Germany he had conceived the idea of an improvement in a sewing machine, in which the feeding apparatus was substantially the same as that patented to Wilson. But he admits that his invention was not perfected until after his arrival in this country. From his own showing, his first machine was made by him at Cincinnati, and was not completed until September or October, 1849. This was six months after Wilson had completed a practical machine, embodying his improvement in the feeding device. If the two inventions were identical, it is apparent that Wilson's, being prior in time, can not be affected or invalidated by a discovery or invention of a later date.

But there is another answer to this attempt to impeach the novelty of the improvement patented to Wilson. The defendant has exhibited a mutilated and imperfect model of his machine, with some affidavits as to the time it was made, and the principle of its operation. Without professing to be an expert on the question of the identity of two mechanical structures, I can not hesitate in the conclusion that the defendant's machine does not embody literally or substantially the feeding device described in Wilson's specification as being his invention.

The main and distinguishing element of his invention is the mechanical device by which curved seams may be sewed. It is this that constitutes its great value, and has made its use indispensable on every practical sewing machine. On this subject, Judge Nelson, after noticing the objection to all prior feeding devices, says: "The object of the improvement in question was to remedy these defects by causing the cloth to be moved automatically under the needle, and the device so arranged as to admit of seams of any curvature." And Judge Ingersoll, in describing Wilson's improvement, says: "Surfaces as before used and applied, could not be used and applied to cloth so as to sew seams of any considerable curvature. By his (Wilson's) devices, the cloth, while held between the surfaces, can be turned and twisted so as to sew curved seams, it being grasped only in a small part of its surface by the feeding clamps."

Now it is clear, from an inspection of the defendant's machine, that it is not adapted to make, and can not make, curved seams. It provides for a wheel, with a series of short

metal points to hold the cloth, and which necessarily prevent it from being turned so as to give a curvature to the seams. The cloth does not move over a flat table or surface, but over an arch or wheel, and can, therefore, only move in a straight direction, and can not be turned, at the pleasure of the operator, so as to produce a curved seam.

Without noticing further the want of identity between the two structures, it may be remarked that the defendant impliedly admits the defects of his invention by the fact that the machines made and sold by him and charged as an infringement of Wilson's patent, are not constructed upon the plan which he claims as his invention. This is conclusive to show that, in his opinion, his device for feeding was entirely defective, as not adapted to the making of curved seams.

Convinced beyond a doubt that the defendant has wholly failed to impeach Wilson's patent on the ground that the invention covered by it is not new and original, I will examine briefly the remaining question, whether the machines made and sold by the defendant, so far as relates to the feeding device, embody the principle of Wilson's invention, so as to constitute an infringement. Without attempting a minute comparison of the two machines, I will refer to the evidence before the court as to their identity, coming from experts upon whose statements and opinions I place more reliance than I should be justified in doing from a mere personal inspection of the structures. The testimony of this class of witnesses, when intelligent and otherwise reliable, is of great value in patent right controversies, involving questions of identity as between two machines. The complainant, in this case, has submitted the affidavits of two witnesses on the point which, for the purposes of the present inquiry, may be regarded as conclusive.

If, therefore, a comparison of the two structures left a doubt as to the identity of the feeding device, the oaths of the two witnesses referred to, uncontradicted as they are, would be quite sufficient to establish it.

It is insisted, in the argument of the defendant's counsel, that in Wilson's device for moving the cloth and holding it to its place in sewing, he describes and claims the use of the needle as a necessary agency, and that as the defendant, in the machines made and sold by him, does not use the needle for such purpose, he does not, therefore, infringe. The first remark to be made on this point is that the defendant's theory is in direct conflict with the oaths of the two witnesses referred to, who clearly prove the identity of the devices for moving and holding the cloth on the two machines. But it appears from the specification of Wilson's reissue 346, that he does not claim the use of the needle for the purpose

before indicated. The first claim is described as "the method of causing the cloth or material, to be sewed in a sewing machine, to progress regularly, by the joint action of the surfaces between which it is clamped, and which act in conjunction, substantially in the manner and for the purpose herein specified." Now, it appears that the objection stated above was urged in the case heard by Judge Ingersoll. In the opinion of the learned judge (Potter v. Holland [Case No. 11,330]), he holds that "the instrumentality of the needle is not required to make the cloth progress or go forward;" and, again, he says: "The way in which the cloth is made to progress regularly by the instrumentality of the two feeding surfaces, without the aid of the needle, is pointed out in the specification."

Judge Nelson, in his opinion (Potter v. Wilson [Id. 11,342]), says: "Now, it is apparent that all the several claims rest upon and grow out of the main improvement of the feeding apparatus, consisting of two surfaces clasping the cloth and advancing it to the needle by the intermittent motion of one of them, and so arranged as. at the same time, to admit of the turning of the cloth, and sewing seams of any practically useful curvature."

It will be observed that neither of the two judges gives a construction to the specification as constituting a claim to the agency of the needle in holding or advancing the cloth, and it is obvious that if the defendant, in his machines, uses the needle in a way different from what it is used in the Wilson machine, it would not protect him from liability as an infringer. if he used the other and material parts of the invention.

But it can not be necessary that the court should enlarge upon the question before it. From the case made by the pleadings and proofs, I am satisfied the complainants have a valid patent, and that the defendant has infringed their exclusive rights under it. These rights, though emanating from and existing under a patent, are as sacred and as well entitled to protection as any other species of property. And although it is conceded that to justify the stringent remedy by injunction, the party seeking it should clearly establish his right. yet. when so established, it is not only a rightful. but often the only remedy which is available for him. Such seems to be the aspect of the present case, and the court can not release the defendant from the operation of the injunction that has been awarded.

The motion to dissolve the injunction is, therefore, overruled.

[For a hearing on a motion for an attachment, see Case No. 11,333. For other cases involving this patent, see note to Potter v. Whitney, Case No. 11,341.]

# Case No. 11,335.

## POTTER v. OCEAN INS. CO.

[3 Summ. 27;[1] 1 Law Rep. 17; 1 Hunt. Mer. Mag. 68.]

Circuit Court, D. Massachusetts. Oct. Term, 1837.

MARINE INSURANCE—GENERAL AVERAGE—ABSENCE OF CARGO—SURVEY AT FOREIGN PORT—EXPENSE—CONSUL'S FEES—REPAIRS.

1. The wages, provisions, and other expenses of the voyage to a port of necessity, for the purpose of making repairs, constitute a general average.

[Cited in The Star of Hope, 9 Wall. (76 U. S.) 236.]

2. It makes no difference in the application of the principle to policies of insurance, that there happens to be no cargo on board, so that there is, in fact, no contribution to be made by cargo or by freight; for general average does not depend upon the point, whether there are different subject-matters to contribute, but whether there is a common sacrifice for the benefit of all, who are, or may be, interested in the accomplishment of the voyage.

[Cited in The Star of Hope, 9 Wall. (76 U. S.) 236; Hobson v. Lord, 92 U. S. 409.]

[Cited in brief in Alexandre v. Sun Mut. Ins. Co., 51 N. Y. 257. Cited in Greeley v. Tremont Ins. Co., 9 Cush. 419; Orrok v. Commonwealth Ins. Co., 21 Pick. 470.]

3. Neither does it make any difference in the application of the principle, that the insurance, on which the question arises, is not for a particular voyage, but on time.

4. If the ship is so disabled by a storm that she becomes unmanageable, and thereby her boat is lost, and the loss is properly attributable to the crippled and disabled condition of the ship by the storm, the loss is properly attributable to the storm, although the cause of it did not occur during the actual continuance of the storm. The rule, causa proxima non remota spectatur, does not apply to such a case.

[Cited in McCargo v. New Orleans Ins. Co., 10 Rob. (La.) 202; Greene v. Pacific Ins. Co., 9 Allen, 217; Indianapolis Ins. Co. v. Mason, 11 Ind. 180; White v. Republic & R. Ins. Co., 57 Me. 93.]

5. Where a survey is properly made at a foreign port, in order to ascertain the amount of damage and the propriety of making repairs, if the damage is a peril insured against, the underwriters are to bear the expense of the survey.

6. A survey need not be, though it commonly is, ordered by a court of admiralty. It may be directed by an American consul, as, by usage, a part of his official duty; or even be made by persons voluntarily appointed by the master, if, under the circumstances, that is a sound exercise of his discretion.

7. There is no law positively requiring, that, in case of a survey, the surveyors should be under oath.

8. There is no statute of the United States fixing the fees to be charged by an American consul for services connected with a survey.

9. In cases of repairs of the damage done to a ship by the perils insured against, the customary deduction of one third new for old, is applicable only to the labor and materials employed in the repairs, and to the new articles purchased in lieu of those which are lost or destroyed; and it does not apply to other incidental expenses, having no connection with the repairs or new articles furnished, and from which the assured can possibly derive no enhanced benefit or value beyond his loss, such as steamboat towage, boat hire, &c.

Action on a policy of insurance, dated the 4th of March, 1836, whereby the Ocean Insurance Company insured the plaintiff [Robinson Potter], "fourteen thousand dollars on the bark Hannah, at sea and in port, for and during the term of one year, commencing the risk on the 3d of March, 1836, at noon. Should this vessel be at sea on a passage, on the expiration of the year, the risk to continue, at pro ratâ premium, until her arrival at her port of destination, paying one half per cent. additional premium, &c., at and after the rate of five per cent. premium." The policy contained the usual risks, and the usual provisions in the Boston policies, and, among other things, a clause, that "the company are not liable for wages or provisions, except for general average." The demandant alleges a loss by the peril of the seas. Plea, the general issue.

At the trial it appeared in evidence, that the bark Hannah sailed from New Orleans on the 4th of November, 1836, with a cargo destined and to be landed at Tampico. In course of the voyage, on the 9th of the same month, in a severe squall from the north, both of the masts were carried away; and, on the 11th of the same month, a heavy gale was experienced, in which a heavy sea struck the stern boat from the stern, and stove it to pieces; and, on the 5th of December following, the bark arrived at Tampico, and delivered her cargo. The necessary repairs, to enable the bark to prosecute any further voyage, could not be obtained at Tampico; and the bark returned to New Orleans, and there the repairs were made. The amount of those repairs, and the incidental expenses of the return to New Orleans, as in case of a general average, and the value of the stern boat, were claimed by the plaintiff from the insurance company. The insurance company paid into court the sum of $947, being the sum admitted by them to be due on account of the repairs. But the company contended that they were not liable for the wages, provisions, and other expenses incurred in the return voyage to New Orleans, as a general average; (1) because the contemplated destination of the bark was, in the regular course of her projected voyage, intended to be directly back from Tampico to New Orleans; (2) because it could not be treated as a case of general average, since there was no cargo intended to be taken back from Tampico to New Orleans. The company, also, contended, that they were not liable for the loss of the boat, as it was lost in another and a distinct storm, and that the loss would not amount to five per cent. It appeared, in evidence, that the crew were shipped at New Orleans, on a voyage "from New Orleans to Tampico, and from thence back to a port of discharge in the United States." The cargo was shipped under a charter party, which

---

[1] [Reported by Charles Sumner, Esq.]

contemplated the landing of the cargo at another port (Metamoras) at the election of the agent of the shippers at Tampico. The master, in his deposition, swore that the voyage was not intended to be directly back to New Orleans; that, on the contrary, it was his intention, after delivery of the cargo, to employ the bark in that way which should be most for the interest of the owner. At the time, he had it in contemplation, to go to Tobasco, for a load of wood to carry to New York. But he was prevented from employing her in that way or any other by the disaster. He also swore that his return to New Orleans was not in the regular course of the projected voyage; but solely for, and from the necessity of the repairs to be made there, as the nearest and most convenient port for that purpose. The counsel for the plaintiff contended (1) that, under the circumstances, the voyage to New Orleans was a voyage of necessity for repairs; that the company were liable to the usual expenses of wages, provisions, &c., for that voyage, as in the nature of general average; (2) that the loss of the boat was solely attributable to the disabled and crippled condition of the bark by the first storm, and her being unable to be kept from rolling in the trough of sea by the want of any proper sails.

The jury were directed to consider these points. If they were of opinion that the return to New Orleans was in the regular course of the voyage, then their verdict on that point ought to be for the defendants;—if, on the contrary, it was a new voyage of necessity for repairs, then their verdict on that point ought to be for the plaintiff. As to the loss of the boat, they were instructed, that if it was a direct result, properly attributable to the disabled and crippled condition of the bark by the preceding storm, and would not have occurred but from that disabled condition, then they were to find for the plaintiff on that point; otherwise, for the defendants. The jury found a verdict on both points for the plaintiff; and by agreement of the parties, a verdict was taken for the plaintiff, for $1.250, subject to the opinion of the court upon the report of an auditor (Willard Phillips, Esq.) appointed to ascertain and report the amount of the loss.

The auditor, having heard the parties accordingly, made his report as follows:

#### REPORT OF THE AUDITOR.

Loss on schooner Hannah in nature of general average of expense of seeking ports of necessity to repair, from Dec. 17th, 1836, to Jan. 17th, 1837.

Chargeable wholly to schooner, no freight or cargo being at risk.

|  | 0-0 off. |
|---|---|
| One half of George Robertson's bill for order of survey, report thereon, extending protest, copy of same, and surveyor's fees, (whole bill $65) | $ 32 50 |
| Captain Barker's bill for boat and men to attend schooner over Tampico bar | 30 00 |
| Pilotage out of Tampico | 10 00 |
| Bill of brig Mary for lumber, and also Henry Frey, carpenter's bill for temporary repairs at Tampico, besides work of crew, in order to fit schooner to make the passage to New Orleans. Barker's deposition—Ans. 28. Waite's deposition—Ans. 22 | 8 00 |

| | |
|---|---|
| Steam tow-boat—Sharp's bill for towing from sea into New Orleans | 225 00 |
| Baily & Abbot's charge for payment of pilotage from sea into New Orleans | 10 00 |
| Baily & Abbot's charge for payment of port-warden and harbor fees at New Orleans | 11 99 |
| Baily & Abbot's charge for payment of entry fee on entering port of N. O. | 2 50 |
| Baily & Abbot's charge for payment of wharfage | 40 00 |

Wages from time of discharging at Tampico until time of arriving at the levee, N. O., 31 days:

| | | | |
|---|---|---|---|
| Captain at $60 per month | $60 00 | | |
| Mate | 50 " " | 50 66 | |
| 7 men | 141 " " | 145 70 | |
| | | | 256 36 |

Provisions for same time:

| | | | |
|---|---|---|---|
| Master 31 days at $1 00 | $31 00 | | |
| Mate " " | 50 | 15 50 | |
| 7 seamen " | 25 each | 54 25 | |
| | | | 100 75 |

| | |
|---|---|
| Commissions of Baily & Abbot, ship's agents, 2½ per cent. on amount of above items | 18 18 |
| Exchange at N. O. on Boston, 2 per cent. on amount of above 745 28 | 14 90 |
| | **$760 18** |

#### PARTICULAR AVERAGE.

| | 1-3 off. | 0-0 off. |
|---|---|---|
| One half George Robertson's bill for order of survey, report thereon, extending protest, copy of same and surveyor's fees | | $32 50 |
| Gerard, blacksmith's bill for repairs at New Orleans | $ 91 87 | |
| Baily & Marcy, carpenter's bill of repairs, whole bill 656 87½—charge for steering sail boom deducted by consent of plaintiff, and proportional part of labor on the same accordingly deducted, (656 : 173 : : 0 50) 171 = 8 21 | 648 67½ | |
| Ferguson & Hall, ship chandler's bill, whole bill 223 73, deduct half cost of paint brushes, 87½ | 222 85½ | |
| Henry Spearing, sail maker's bill | 294 18 | |
| Steamboat Pacific's bill for towing across the river to ship yard for repairs | 15 00 | |
| Baily & Abbot's charge for payment of fees of survey at New Orleans | | 15 00 |
| Baily & Abbot's charge for payment of bill for towing from ship yard to the levee | 20 00 | |
| Captain Barker's bill of amount paid six men for labor in repairs, 245 62 | 245 62 | |
| To his bill, amount paid other men for mooring schooner, and terrage at sundry times | 19 50 | |
| New yawl boat as certified by Captain Barker | 75 00 | |
| Captain Barker's charge for his own services attending to repairs, 30 days, at $2 per day | 60 00 | |
| His board same time | 30 00 | |
| The mate's wages for assisting during repairs, at $50 per month | 50 00 | |
| His board same time, $1 per day | 30 00 | |
| William Roswell, notary public's fees, for arranging and attesting in duplicate the vouchers and documents relating to the repairs | | 10 00 |
| Postages from New Orleans to Newport | | 4 75 |
| | **$1,802 70** | **$62 25** |
| Commissions of Baily & Abbot, ship agents, at 2½ per cent. | 45 06 | 1 56 |
| | **$1,847 76** | **$63 81** |
| Deduct old materials | 85 60 | |
| | **$1,762 16** | |
| Deduct 1-3 for new | 587 38 | |
| | **$1,174 78** | 1.185 03 |
| | | **$1,238 79** |
| Exchange at New Orleans on Boston, 2 per cent | | 24 77 |
| | | **$1,263 36** |
| Whole amount of loss | | **$2,023 54** |

The parties having been heard on the subject of the above report, the defendants object:

1. To including the fees for the survey at Tampico, on the ground, 1st, that the consul

had not jurisdiction to order a survey, and that it should have been ordered by a maritime court; 2d, that the surveyors do not appear to have been sworn; and, 3d, that the fees exceed the rate which an American consul is authorized by law to charge.

2. That the defendants are not liable for any of the expenses of the passage to New Orleans, on the ground, 1st, that a pending voyage was not interrupted to seek a port of necessity; 2d, that the Hannah would have probably gone to New Orleans, had she not needed repairs, as the shipping articles provided only for a return to a port of discharge in the United States.

3. That the second, third, and fourth items on the second page of Gerard, the blacksmith's bill for iron work on the jib-boom (as the auditor reads the account) amounting to $3.50, ought to be struck out, there being no evidence of loss or injury to the jib-boom. (They are included in the adjustment, because the schooner appears by the evidence to have been nearly new and well fitted out and furnished, and the master and mate both mention in their depositions, injury to the iron work in the disaster, by which the loss was occasioned, without undertaking to specify every particular, which the auditor supposes would have been impracticable.)

4. That the charge of $10.53, and a proportional part of labor, in Baily and Marcy, carpenter's bill, for a boom, 38 feet long, should not be allowed, on the ground, that there is no evidence of two booms being broken at the time of the disaster occasioning the loss. (This is included by the auditor for the reason that the schooner is proved to have been in good condition previous to the voyage, and that the spar rather appears by the log-book and other evidence, to have been broken or carried away at the time of the principal disaster, than at any other, and the survey at New Orleans alleged the captain to have stated to the surveyors, that two booms—viz. the topmast and lower studding sail booms—were lost on the ninth of November. This is the only direct evidence of the loss of the two booms on that day. The log-book, November 9th, and the captain and mate's depositions, answer 12, omit mentioning specifically, the loss of any booms on that day, the statement in all being that the heads of the foremast and mainmast were both carried away above the eyes of the rigging, and topmasts, tops, crosstrees, trussel-trees, and "some of the small spars" broken. One of the booms in the carpenter's bill is described to be the studding sail boom, 26 feet long, the other is not described, but is said to be 38 feet long; but the rate per foot, and the price at which it is carried out, show a mistake in the length, and that it was but 28 feet long. And it has been stated to the auditor, by an experienced person, that these spars may well enough come under the de-

scription of "small spars," on board of a schooner of the size of the Hannah.)

5. That the charge of $1.75 for three paint-brushes in shipchandler's bill should not be allowed, on the ground that the vessel ought to have paint-brushes as a part of its outfit. (Considering that the owners are not obliged to use their own paint-brushes, if they have any, for repairs of damages within the risks insured against, and that the three brushes purchased were probably not worn out in painting the schooner at New Orleans, but remained for the use of the owners, the auditor has included one half of the cost of them.)

6. That the charge in the same bill for pump leather, $4.50, and pump tacks, 88 cents, ought not to be included, as there was no evidence of any extraordinary injury to the pumps, and the owner ought to repair damage occasioned by mere wear and tear. (But as the auditor understands, that these descriptions of articles are not intended exclusively for the pump, but are used for divers purposes about a vessel; that the leather particularly is used in putting up and repairing rigging; and as there does not appear to have been any extraordinary wear and tear of the pumps, the probability seems to be, that these articles were used for other purposes than repairing the pumps.)

7. That the copal varnish charged in the same bill, $3.00, is rather for ornament than utility, and so ought not to be charged to the underwriters. (The auditor, however, understands from an experienced person, that this article is ordinarily used on the deck, and often on the sides.)

8. That the deterioration of the sails from the 9th of November to the time of arrival in New Orleans ought not to be allowed for in adjusting the average. That is, that the underwriters ought to be liable only for the repairs of the sails in the state in which they were directly after the damage insured against was done. The damage to the sails by such wear and tear might be from $20 to $25. (This deduction is not made in the adjustment reported, because the auditor understands the allowance of one third for new to cover it, and that makes no difference whether the depreciation for which the allowance is made, is occasioned by use before the loss, or afterwards, before repairs can be made.)

9. That there is no proof of damage by the disaster of the 9th of November to the main royal sail, that rendered a new one necessary, and that the new one accordingly ought not to be charged in the adjustment. (The survey at New Orleans recommends this new sail, and the auditor considers the evidence of the circumstances of the disaster as well as the general statement in the log-book, protest, and depositions as to damage to the sails, sufficient proof of this part of the loss.)

10. That the old sails, which were directed

by the surveyors to be sold, do not appear to be accounted for. (The plaintiffs have produced the affidavit of the master, dated November 20, 1837, stating, that the old sails were included in the proceeds of old materials accounted for.)

11. That the item for wharfage, $40, ought not to be included. (The auditor understands that every vessel is subjected to a charge on coming up to the levee at New Orleans, varying according to the tonnage, and covering the two expenses of dockage and wharfage charged in some other ports. The charge is exacted on the vessel's coming to the levee; and is the same, whether she discharge or takes in a cargo, or does not. The auditor, therefore, considers it as among the expenses incidental to making the port to refit, and that, though the vessel afterwards takes on board a cargo there for Boston, without any additional charge for wharfage, still this advantage, if any, is considered to be merely casual and incidental, and not to be taken into account in adjusting the average.)

12. That the fees of the port-wardens for survey at New Orleans ought not to be charged, on the ground of there being no necessity for a survey, and that it was not an authentic survey. (This charge is included, because the auditor understands it to be usual to survey in that port under similar circumstances, and because it appears to him, that the master acted prudently in having the survey made independently of any consideration of the customary course at that port. As to the survey being an authentic one, it appears by the testimony that the port-wardens are sworn officers; and the auditor understands, from the testimony in the case, that the matter came before them as port-wardens. The auditor is not aware of any particular forms being very rigidly required in making surveys. The master having pursued the customary course, the charge is included.)

13. That the expense of towing the schooner from the shipyard across the river back to the Levee, after she was repaired, ought not to be included. (The auditor understands that a ship at a ship-yard across the Mississippi, for repairs, is not in a position for commencing any enterprise, and that to be in such a position she must be towed across the river to the Levee again. The expense of towing her back is accordingly included in the adjustment.)

14. That Captain Barker's bill of $355.12 for labor, not being receipted, is not a sufficient voucher for that payment. (This bill appears to have been one of the documents annexed to Captain Barker's affidavit made before Mr. Roswell, notary public at New Orleans. That affidavit states, "All the materials and work charged in the annexed bills were furnished or done to the schooner." This is considered by the auditor as rendering the bill a sufficient voucher.)

15. That, as the Hannah did not sail from Tampico until the 5th of January, 1837, the charge for wages and provisions of the crew, if made at all against the underwriters, should not commence until that time. (The charge is begun from the 17th of December, 1836, in the adjustment, because the schooner was then fully discharged, and began to refit by temporary repairs and otherwise, to New Orleans.)

16. That, if the defendants are chargeable with the expenses of going to New Orleans, they ought to be credited with the proceeds of the sand ballast brought from Tampico. (This the auditor would have credited and asked the plaintiffs for an account of such proceeds. The captain makes affidavit, November 20, 1837, that the expenses attending the discharge of this ballast, were equivalent to the proceeds, viz. $32.)

17. That the wages and board of the mate during the repairs, $80, ought not to be included, on the ground that one person, the captain, was enough to attend to the repairs. (This charge is included in the adjustment, because the mate or some other person was wanted, as a ship keeper, and also because it does not appear but that the mate was as usefully employed about the repairs, as any other person who was employed about them.)

18. That the charge $10, by Mr. Roswell, the notary public at New Orleans, for arranging and authenticating the documents relating to the repairs, ought to be rejected. (This charge is included because it seems, under the circumstances, to have been the prudent step on the part of the master, to authenticate and forward to his employers. the vouchers for his expenses, and though the charge for this service by the notary, is higher, perhaps, than would be made in some other ports, yet the charges and fees at New Orleans, are well known usually to be high.)

The plaintiff objects: That the expense of towing the schooner across the Mississippi to be repaired, $15, and that of assistance in getting her across, and boat hire, $19.50, and that of towing her back after the repairs had been made, $20, ought not to be subject to the deduction of one third for new. (The adjustment was made by a deduction of a third from the items in question, merely because it is the more usual and general, though not the invariable practice, so to adjust a particular average in Boston. The auditor understands from a very experienced insurer, that there are exceptions to, or variations from, this practice, in the port of Boston. The adjustment was made in the above manner, without any evidence of, or reference to, any general commercial custom beyond Boston, in support of it, and without any consideration, on the part of the auditor, of the rule on this subject, to which the principles of the maritime law and the law of insurance would lead.)

Willard Phillips.

F. C. Loring, for plaintiff.

Paine & Aylwin, for defendants.

STORY, Circuit Justice. Upon most of the exceptions which have been argued, I do not think it necessary to make any particular remarks, as the reasons given by the auditor for his allowance and disallowance of items are entirely satisfactory to me. Indeed, considering his acknowledged professional learning, and great experience in this branch of the law, it would be difficult not to give his opinion great weight as to the practical adjustment of losses.

In respect to the leading objection which has been taken to the report, that it allows the expenses of wages, provisions, &c., of the voyage back to New Orleans, as in the nature of a general average, the jury have found that the voyage was a voyage of necessity for repairs to a proper and convenient port. According to the established doctrine in the Massachusetts courts, the wages and provisions of the crew, and other expenses, on such a voyage of necessity constitute a general average. It was so held in Padelford v. Boardman, 4 Mass. 548, and Clark v. U. S. Fire & Marine Ins. Co., 7 Mass. 365. See, also, 1 Phil. Ins. 348, 349; 2 Phil. Ins. 241, 242. But the argument is, that here there was no cargo on board, and that there can be no contribution by freight or cargo; but the whole is to be borne by the ship; and that, therefore, it is a particular average on the ship, and not a general average. The argument proceeds upon the ground, that what is, and what is not a general average, does not depend upon the nature and objects of the thing done, or sacrifice made, for the general good; but solely upon the point, whether there are in fact different contributory subjects. I do not so understand the law. As I understand it, the rule, as to what constitutes a general average or not, is founded upon the consideration, whether it is for the benefit of all, who are, or may be interested in the accomplishment of the voyage; or only for the benefit of a particular party. Suppose a person to be owner of the ship and cargo, and of course ultimately of the freight also; and he should insure the ship, cargo, and freight in three different policies, by different offices, if a jettison should be made, or a mast be cut away, or any other sacrifice be made for the common benefit of all concerned in the voyage; there can be no doubt that this would be a case of general average; and the underwriters on ship, cargo, and freight must all contribute as for a general average. What possible difference in such a case could it make, that the same underwriters were underwriters in one policy on the ship, cargo, and freight? or that the owner singly had no insurance at all, or an insurance upon one only of the subjects put at hazard? Must not the loss still be treated in the contemplation of law,

as a general average, or in the nature of a general average? As I understand it the phrase, "general average," as found in our policies of insurance, is used in contradistinction to particular average. It means a voluntary sacrifice for the benefit of the voyage, and not merely an involuntary encounter of a loss without action or design. It looks to the efficient cause of the loss; and not to the effects of it. It looks to the consideration, whether the act is intended for the benefit of all concerned in the voyage; and not in particular to the consideration, who are to contribute towards the indemnity. To be sure, if the owner stands as his own insurer throughout, the question degenerates into a mere distinction; for it is a pure speculative inquiry. Not so, when there is an insurance; for in such a case, the underwriters are, pro tanto, benefited by the sacrifice or other act done; and they are, in a just sense, bound to contribute toward it. In the present case, the insurance was not upon any particular voyage; but it was on time. Unless the owner had a right to repair the bark so as to perform other voyages, within the year, at the expense of the underwriters, he must have had a right to abandon to the underwriters for a total loss; for in her crippled condition, the bark was incapable of any further employment. The going to New Orleans, therefore, was not an act solely for the benefit of the ship-owner; but was for the benefit of the underwriters, also, to save them from a total loss. The plaintiff was bound to repair, if he could, and to seek some convenient port for that purpose; and the expenses of going thither were properly incidental expenses to the repairs, in the nature of a general average, to replace the bark in the condition in which she was before the accident. If the plaintiff was not fully insured, he must contribute his proportion toward the common expenditure in going to New Orleans. If he was fully insured, he has only shifted the whole loss upon the underwriters. The expenses of going to New Orleans are just as much a matter of general average, as would have been the expenses of towing the bark into port, if she had become water-logged, or incapable of getting to a place of repairs, without the employment of an additional crew. Suppose, after the disaster, and arrival at Tampico, it had been necessary to employ a steamboat, to tow the bark to New Orleans to repair, would not the underwriters have been liable to pay the expenses as in the nature of salvage? If, in order to constitute a case of general average, it be necessary, that there should be some cargo on board, or some other things besides the ship at hazard, what is to become of the case of an insurance on an empty ship, whose masts are cut away in a storm, or which, after losing her masts, is compelled to be brought into port by salvors, in consequence of the disabled state of the

ship and the crew? Are not the underwriters bound to pay the loss and the salvage? If so, are not these emphatically charges in the nature of a general average? Suppose an empty ship, which is insured, is dismasted in a storm, and is compelled to put away into a port of necessity. in order to repair; or otherwise she must be abandoned at sea; are not the expenses of the voyage in such a case to the port of necessity of the nature of a general average? Are they not incurred, as much for the benefit of the underwriters, as for the ship owner? I put these cases, because it seems to me, that they bring the principle of the argument to its true test. And it seems to me, that it would be an entire novelty in cases of insurance, not to hold that, under such circumstances, the underwriters were liable for the charges. as in the nature of a general average. If so, the clause in the policy, that the company are not liable for wages and provisions, "except in general average," is wholly inapplicable, for the present case is brought within the meaning of the exception. I have no difficulty, therefore, in overruling this objection.

In relation to the next point of objection, as to the payment for the loss of the boat; it seems to me to be disposed of by the verdict of the jury. They have found, that it was a direct consequence attributable to the preceding storm; so that the principle, in case of loss, that, "causa proxima, non remota spectatur," is not at all interfered with. If the bark had become wholly unmanageable and innavigable from the immediate effects of the storm, I do not well see how the direct results from that unmanageableness and innavigability are to be treated otherwise than as a part of the loss. The storm is still the causa proxima. In causes of this sort, it will not do to refine too much upon metaphysical subtilities. If a vessel is insured against fire only, and is burnt to the water's edge, and then fills with water and sinks; it would be difficult, in common sense, to attribute the loss to any other proximate cause than the fire, and yet the water was the principal cause of the submersion. If a vessel be insured against barratry of the master and crew, and they fraudulently bore holes in her bottom, and thereby she sinks, in one sense she sinks from the flowing in of the water; but in a just sense, the proximate cause is the barratrous boring of the holes in her bottom.

In relation to the item for the survey at Tampico, there are three objections stated in the exceptions to its allowance. First, that the consul had no jurisdiction to order a survey; and that it should have been ordered by a maritime court. It is certainly the usual practice of courts of admiralty, and I deem it a very useful and beneficial practice, to order surveys in cases of this sort, as a matter of admiralty and maritime jurisdiction within their cognizance, and in my judgment, right-

fully within their cognizance.[2] But I am not aware that it has ever been held to be indispensable to the validity of a survey that it should emanate from such a source. The object of a survey is to assist the judgment of the master. as to his proceeding to repair damage, or to sell the ship. It is designed to protect him in the fair discharge of his difficult and often critically responsible duty in great emergencies. by giving him the aid of the opinion of other men of sound judgment. intelligence, and skill in naval affairs. Indeed, this course is so universally adopted in practice, that a master. who should venture to deviate from it. would be treated as guilty of some improvidence, if not of gross rashness and neglect of duty. A survey is a common public document, looked to both by underwriters and owners, as affording the means of ascertaining upon the very spot, at the very time, the state and condition of the ship, and other property at hazard. In some policies. as for example, when what is technically called the "rotten clause" is inserted, such a document seems indispensable; as the survey may amount to a discharge of the underwriters. See cases on this clause. Dorr v. Pacific Ins. Co., 7 Wheat. [20 U. S.] 582; Janney v. Columbian Ins. Co., 10 Wheat. [23 U. S.] 411. 416–418; 1 Phil. Ins. 154, 158. But although surveys are and may be thus ordered by courts of admiralty, I am not aware, as I have already said. that this is an indispensable requisite. On the contrary, a survey may be made upon the mere private application of the master directly to the surveyors; and there does not seem any good reason, why, if an American consul should interpose in behalf of the master, and with a view to assist him, should appoint the surveyors at his request. and thereby sanction their competency to the task, such an appointment should be deemed objectionable. As a known public officer, the act of a consul would, even if he had no express or implied authority to make the appointment ex officio, be deemed an act of higher authority, and more entitled to public confidence. than that of the master himself, and might be an inducement to the surveyors to undertake the duty, with more promptitude and responsibility. But I am not aware, that the issuing of a commission for a survey is, in truth, beyond the rightful authority of a consul in cases of this sort. That depends upon the course of trade and the common functions established by the general consent and customs of nations in regard to consuls. Our own statutes do not pretend to ascertain, or establish their rights, or their duties generally.

[2] This jurisdiction seems incidentally affirmed in the case of Dorr v. Pacific Ins. Co.. 7 Wheat. [20 U. S.] 612. 613. and of Janney v. Columbian Ins. Co., 10 Wheat. [23 U. S.] 411. 418. Among my own MSS. is a copy of a decree of the admiralty court at Boston. in 1745. before Judge Auchmuty, in which. upon petition of the master to survey a vessel (The Three Marys). she was condemned, and ordered to be sold as unseaworthy.

but have merely given them certain authorities. One of these statutes has declared, "that the specification of certain powers and duties, &c., &c., shall not be construed to the exclusion of others, resulting from the nature of their appointments, or any treaty or connection under which they may act." Act 1792, c. 224, § 9 [1 Stat. 257]. Whether acts of this nature are usually done by consuls, is more than I know. But in the absence of all controlling proof, the fact, that the consul did make the appointment in this case, affords some presumption that it was a rightful exercise of authority. Be this as it may, there is no ground to say, that it is indispensable that surveys of this sort are absolutely required to be made under the authority of any maritime court. On the contrary, I am strongly impressed, that they are often made under the authority of other magistrates, and often at the mere private request of the master. See Wesk. Ins., tit. "Certificate," p. 89; Id. "Damage," p. 162, § 5; Id. "Estimate." The other objection to the survey, that the surveyors do not appear to have been sworn, is equally untenable. There is no law positively requiring it to be done. The remaining point under this head, as to the fees charged by the consul, is unmaintainable; for there is no law fixing his fees in a case of this sort.

In regard to the survey at New Orleans, the reasons given by the auditor for the allowance seem to me entirely satisfactory. It was a proper precaution to guard against any future difficulty in adjusting the loss; it might be important to the underwriters, as well as the ship-owner, as one of the appropriate documentary proofs to establish and limit the extent of the loss. See Benecke & S. Average (by Phillips; 1833) p. 384.

In regard to the deduction of one third new for old, the true interpretation of that rule has always appeared to me to be, that it is strictly applicable only to the labor and materials employed in the repairs, and to the new articles purchased in lieu of those, which were lost or injured by the disaster. It would be strange to apply it to other independent expenses, which were merely incidental to the loss; for in no just sense can it be said, that the owner is benefited thereby, or that he receives an enhanced value therefrom, beyond his indemnity. I am not aware, that any different exposition of the rule has ever been judicially established. The case of Sewall v. United States Ins. Co., 11 Pick. 90, so far as it goes, is confirmatory of it, as indeed is the text of the best elementary writers on the subject. 1 Phil. Ins. 371, 372; Benecke & S. Average, (by Phillips) 167; Note. Id. 238, 374, 384, 385. For this reason and upon principle. I think, that the deduction allowed by the auditor of one third from the amount of the expense of towing the schooner across the Mississippi ($15), and that of assistance in getting her across and boat hire ($19.50), and that of towing her back ($20), ought not to stand. It is true, that from the report, it seems to have been the

more general practice, though not a universal practice, in Boston, to make the deduction; and the auditor has stated, that this was his sole reason for allowing it, he having no reference to the principles of maritime law on the subject. But though the sum is trifling, I think the practice of making the deduction is inconsistent with principle, and ought not to be permitted to stand. It has a tendency to introduce confusion, and to perpetuate perplexing questions, as to what items are, or are not within the reach of the rule. If we stand by the purport of the rule in its simple form, as applicable merely to the labor and materials used in the repairs, or in the replacing of lost or injured articles, very little difficulty can arise in its practical application. Upon the whole, my judgment is, that the auditor's report ought to stand confirmed, except as to the deductions allowed upon these three small items; and, as to them, it ought to be reformed; and the verdict awarded and entered for the plaintiff accordingly.

NOTE. I have been furnished with a MS. copy of the report of the case of Bixby v. Franklin Ins. Co. [8 Pick. 86], at the November term, 1828, of the supreme court of Massachusetts. The report of the case is as follows: "This was assumpsit on a policy of insurance made by the defendants, on the 3d day of January, 1825, on the brig Columbia and her cargo, on a voyage from Boston to a port or ports of the island of St. Domingo, and thence to her port of discharge in the United States. $2,500 was insured on the cargo, and $1,500 on the brig, which was valued in the policy at $2,000. The brig sailed on the 7th day of January, 1825, bound for the island of St. Domingo, as the mate testified, whose deposition was used on the trial, and is in the case, and on the 10th day of January met with a storm, in which she received the injury for which the suit is brought. When the weather moderated, the brig bore up for the first convenient port, and the first she made was Paix, in the island of St. Domingo. Finding it impracticable to obtain repairs there, or at any other port at which she touched, she went into Maragoane. The plaintiffs introduced evidence to show, that, in the state of the brig, and the course of the winds, it was impracticable for them to go to the city of St. Domingo, or any port to the eastward of the one she took, or to procure the necessary repairs at Maragoane, or at any other port in the island of St. Domingo. After discharging her cargo, and making some partial and temporary repairs, the brig proceeded in ballast to Wilmington, in North Carolina, where thorough repairs were made, and the vessel returned with a cargo to Maragoane, and took in her return cargo, and came back to Boston. No loss was claimed on the cargo. The defendants, on trial, proposed to show, by the log-book of a former voyage, that the brig in the preceding year, under the command of said Hibbert, but not with the same mate as on this voyage, made a voyage from Wilmington to Maragoane, and then back to Boston, and expected thereby to diminish the plaintiff's claim for seamen's wages, victualling, &c., by showing that the brig had not been obliged to depart from her accustomed and intended voyage. This was objected to by the plaintiff's counsel, and rejected by the judge, but the fact that the vessel did make such a voyage, was admitted by the plaintiff.

"The jury assessed damages on the ground of a partial loss. By the decision of the judge, with the assent of the parties, the jury omitted to consider and find damages for the seamen's wages and expenses of protest, surveys, &c., at

Maragoane, and wages from thence to Wilmington, where the crew were discharged on arrival. Should the action be sustained, an assessor is to be appointed by the court, who, under the orders of the court, shall assess the proper amount for wages and expenses as aforesaid, which is to be added to the verdict. The policy is made in the name of Bixby, Valentine & Co. and Joseph Hibbert, the captain. The firm of Bixby, Valentine & Co., consists of Luther Bixby, John S. Valentine and Orpheus Holmes. Before that copartnership was formed, Holmes and Hibbert owned the brig, in equal parts—they having purchased her of Samuel Upton, by a bill of sale, and taken out the papers in their own names. Neither at the time the copartnership was formed, in the summer of 1824, nor afterwards, was there any transfer made by Holmes, of his half of the brig to Bixby, Valentine & Co., by any bill of sale or other document, but she still continued to stand at the custom-house in the names of Holmes and Hibbert. On the 4th day of January, 1825, the day after the policy was made, Holmes and Hibbert surrendered their enrollment and took out a register for the brig, when Holmes swore that he, with the said Hibbert, were the only owners of said brig, and some years afterwards, she was sold and conveyed by Holmes and Hibbert, only by a regular bill of sale, to Nesmith and Leeds. When the copartnership of Bixby, Valentine & Co. was formed, a credit was entered in their books to Holmes for the estimated value of one half of the said brig, in the hand-writing of Holmes, who became book-keeper of the firm—and in the annual accounts of the company's stock, one half of the brig was introduced, till she was sold to Nesmith and Leeds, and until that sale, the said one half of the brig had been treated as the property of said company, and the repairs which were made on the brig from time to time, were paid for by the company. The policy, register, and bill of sale to Nesmith and Leeds, and all the papers used at the trial, may be referred to.

"The defendants object to the recovery of the plaintiffs at all. 1st. On the ground that Bixby and Valentine had no legal interest in the vessel. 2d. That if they had any capable of being insured, it was not insured by this policy, and no loss can be recovered in this case. If the court should be of opinion that these objections are well founded, the plaintiffs shall be nonsuited. Or, if the log-book was legally admissible for the purposes for which it was offered by the defendants, a new trial shall be ordered. Otherwise, judgment shall be rendered on the verdict, with such additions as shall be made by an assessor, to be appointed as aforesaid, or the court may make any other disposition of the action which law and justice may require."

The cause was afterwards, at March term, 1829, referred to an auditor, whose report was as follows:

Expense of seamen's wages at Maragoane, from the arrival of the Columbia at the port, on the 5th of February, 1825, to her departure from that port, March 9th, 1825.—one month and four days. The time of arriving and sailing are stated in the log-book and protest.

| | Rate of Wages. Month. | Time. Days. | Amount. | Vouchers. |
|---|---|---|---|---|
| Captain Hibbert | $30 1 | 4 | $84 00 | Shipping Papers. |
| Barrett (mate) | 24 | " | 27 60 | " |
| Wilson (seaman) | 12 | " | 13 80 | " |
| Rollock | " 13 | " | 14 95 | " |
| Rams | " 14 | " | 16 10 | " |
| Greene | " 11 | " | 12 65 | " |
| Cushing | " 14 | " | 16 10 | " |
| | | | $135 20 | |

Provisions for the same time; estimating for the captain $1 per day, for mate 50 cents, seamen 25 cents,—making $2.50 per day for thirty-two days,   80 00

$215 20

The brig sailed from Maragoane March 9th, 1825, and arrived at Wilmington, N. C., March 28th, and discharged her crew March 29th,—twenty days (time stated in the log-book).

| | Rate of Wages. | Time. Days. | Amount. | Vouchers. |
|---|---|---|---|---|
| Barrett (captain) | $30 | 20 | $20 | Rate of Barrett's wages not stated; wages of Captain Hibbert assumed, Shipping Papers. |
| Hildrup (mate) | 24 | " | 16 | |
| Four seamen; one at $11, one $12, one $13, two at $14 per month, | 64 | " | 42 66 | |
| | | | $78 66 | |

Provisions at the same rate as above   50 00

$128 66

The brig sailed from Wilmington May 8th, 1825, arrived at Maragoane, June 17th, forty days—one month and nine days—(stated in the log-book).

| | Rate of Wages. Month. | Time. Days. | Amount. | Vouchers. |
|---|---|---|---|---|
| Captain | $30 1 | 9 | $39 | The rate of wages actually paid for this passage are not stated in the documents. The plaintiff assents to the previous rate, which is probably below that actually paid. |
| Mate | 24 | " | 31 20 | |
| Five men, at the same wages as above. | 64 | " | 83 20 | |
| | | | $153 40 | |

Provisions at the same rate as above, viz $2.50 per day, for officers and men for forty days,   100 00

$253 40

Expense of documents at Maragoane:

| | | Vouchers. |
|---|---|---|
| Protest, | $16 50 | Amount charged in an account purporting to be rendered by Capt. Hibbert. |
| Interpreting, | 16 00 | Cazier's receipt. |
| Translating, | 17 00 | William Bastu's receipt. |
| Clearance, | 4 50 | Charged in an account purporting to be rendered by Capt. Hibbert. |

$54 00

Note.—An item of $64 is charged in the accounts purporting to be rendered by Capt. Hibbert, for officer's fees; and $15 for port-warden's fees.

WILLARD PHILLIPS, Assessor.

From a memorandum on the back of the report, in the handwriting of the late Mr. Chief Justice Parker, the final opinion of the court was in favor of the plaintiff, for the allowance of the wages and provisions in going to the first and second ports of necessity, and also the expenses of the documents, &c., connected with the transactions. The vessel and cargo appear to have been owned by the same persons. The memorandum of the chief justice is in these words:—"We are of opinoin, that only so much of the damages found by the assessor as relate to the expense at Maragoane, from thence to Wilmington (N. C.) and at Wilmington until the crew were discharged, can be allowed. That from thence the vessel began a new voyage, instead of resuming the voyage from which she was driven by necessity. If the plaintiff is content with this, he may have judgment; otherwise, the cause must remain for argument at the adjournment.—J. P." The parties (it is understood) acquiesced in this opinion.